NOTICE
Decision filed 03/14/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 210323-U

NOS. 5-21-0323, 5-21-0324 cons.

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* T.B. and A.B., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Union County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Nos. 18-JA-47 & 18-JA-48 |
| v. | ) | |
| | ) | |
| Hollis B., | ) | Honorable |
| | ) | Amanda Byassee Gott, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Presiding Justice Boie and Justice Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's finding that the respondent father was unfit is affirmed where the State proved that he was unfit by clear and convincing evidence.

¶ 2    The respondent father, Hollis B., appeals the judgment of the circuit court of Union County terminating his parental rights to his minor children, T.B. and A.B. On appeal, Hollis B. argues that the court's findings that he was an unfit parent under sections 1(D)(b), (g), (m)(i), and (m)(ii) of the Adoption Act (750 ILCS 50/1(D)(b), (g), (m)(i), (m)(ii) (West 2020)) were erroneous because the State failed to prove him unfit by clear and convincing evidence. For the reasons that follow, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4     T.B., born on February 20, 2012, and A.B., born on April 23, 2013, are the

biological children of Christina L. and Hollis B.[1]  This appeal involves the termination of

Hollis B.'s parental rights to T.B. and A.B.  However, facts relating to Christina L. will be

discussed as necessary to provide relevant background for the issues presented.

¶ 5     On November 1, 2018, a call was made to the Illinois Department of Children and

Family Services (DCFS) alleging frequent physical and emotional abuse to T.B. and A.B.

It was also alleged that the children were not in a safe environment due to drug use by the

parents.  Their house was filthy and frequently without utilities.  The neighbors would often

feed the children.  Hollis B. and Christina L. would lock the children out of the house and

leave them home alone for extended periods of time.

¶ 6     On November 6, 2018, the State filed a petition for adjudication of wardship for

T.B. and A.B. alleging that they were neglected pursuant to section 2-3(1)(b) of the

Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018))

because their environment was injurious to their welfare.  The petition alleged that

(1) Christina L. was convicted in Williamson County for possession of methamphetamine

and was on probation, (2) Hollis B. was on probation for a methamphetamine-involved

conviction, (3) on November 2, 2018, A.B. disclosed that he and T.B. had been left home

alone and walked to a neighbor's house because they were scared, (4) the minors were too

_____

[1]Although Hollis B. married Christina L. after T.B.'s birth, Hollis B. was referenced as T.B.'s father throughout the proceedings.  The State provided notice to any and all unknown fathers by publication, and no unknown father appeared during the proceeding.

young to be left alone with one providing care for the other, (5) A.B. disclosed that Hollis B. drank beer "all the time" and smoked marijuana, (6) A.B. said that Christina L. told him he could not talk about drugs, (7) T.B. corroborated the alcohol and cannabis use, and (8) the parents refused to submit to drug tests and admitted they would be positive for cannabis.

¶ 7    The petition for adjudication of wardship also alleged abuse pursuant to section 2-3(2)(i) of the Juvenile Court Act (*id.* § 2-3(2)(i)) because of excessive corporal punishment by Hollis B.  It was specifically alleged that he put Christina L. in a "choke hold"; T.B. witnessed this and demonstrated what a choke hold was by placing her arm across her throat.  A.B. disclosed that Hollis B. spanked him with his pants down using a paddle, hand, shoe, or belt on A.B.'s buttocks and legs.  Christina L. would yell at Hollis B. to stop but to no avail.  A.B. disclosed that the spankings left marks described as "welts."  Hollis B. had also threatened to hit the next-door neighbor that the children referred to as "Nana." T.B. also corroborated the allegations of Hollis B. hitting A.B.

¶ 8    Also on November 6, 2018, the trial court held a shelter care hearing, during which Hollis B. and Christina L. stipulated to the allegations in the petition.  The court entered a temporary custody order with respect to A.B. and T.B., finding that there was an immediate and urgent necessity to remove them from their parents' care and that leaving T.B. and A.B. in their home was against their health, welfare, and safety.  The court found that there was probable cause for the filing of the petition because the minors both disclosed that they had witnessed domestic violence and drug use between their parents; the minors disclosed excessive corporal punishment resulting in welts appearing on their legs and buttocks; they

3

had been left alone for unreasonable periods of time with no adult supervision; the parents had methamphetamine-related criminal involvement and refused drug tests; and both parents stipulated to the allegations in the petition for adjudication of wardship. Thus, temporary custody of T.B. and A.B. was placed with DCFS. The parents were admonished to cooperate with DCFS, and DCFS was ordered to provide necessary services for substance abuse, parenting, and domestic violence.

¶ 9   On April 22, 2019, DCFS prepared an initial report and family service plan. The services recommended for Hollis B. were to complete an integrated assessment, comply with any recommended services, complete a substance abuse assessment, cooperate with Caritas Family Solutions (Caritas) and DCFS, maintain a substance-free lifestyle, submit to drug testing, complete a domestic violence assessment, participate in domestic violence counseling, abstain from further episodes of domestic violence within the home, complete a mental health assessment, complete parenting classes, and obtain suitable housing and employment.

¶ 10   On September 12, 2019, the case was set for an adjudicatory hearing. Prior to the hearing, the parents stipulated to the two paragraphs of the juvenile petition regarding their criminal history involving methamphetamines. The parties agreed to a continuance under supervision for a period of 12 months for the parents to complete the service plans developed by DCFS. During the hearing, Hollis B. mentioned that Caritas was supposed to help pay for the classes the parents needed because their insurance was not accepted. Dylan Winters, a Caritas caseworker who was present at the hearing, indicated to the trial

4

court that the agency was working on resolving the financial issue. The court admonished the parents to cooperate with DCFS or they would risk termination of their parental rights.

¶ 11 Thereafter, the trial court entered an order of continuance under supervision, noting that the parents admitted the allegations in paragraphs 5(a) and (b) of the petition, the admissions were knowingly and voluntarily made, and a factual basis existed for their admission. The minors would remain in custody and guardianship of DCFS, and the parents were awarded supervised visitation at the discretion of DCFS or Caritas. The parents were ordered to cooperate with DCFS, comply with the terms of their service plans and any service plans developed during the continuance, complete the recommended services in a timely manner, and correct the conditions that required the minors to be removed from the home. A status conference was set for December 19, 2019, in anticipation of the completion of the service plans and to return the minors home before Christmas.

¶ 12 On December 19, 2019, the State filed a motion to terminate the order of continuance under supervision. The State alleged that the parents failed to cooperate with DCFS, failed to complete the services required to successfully return the minors home, and failed to correct the conditions that brought the minors into care. Attached to the petition was a status report completed by DCFS.

¶ 13 The DCFS status report from December 3, 2019, reported that Hollis B. had received a copy of his service plan. The caseworker requested reports from service providers and had not received anything in response to this request. Hollis B. self-reported that he applied for a job and was waiting to hear back. To the caseworker's knowledge,

Hollis B. had not started domestic violence counseling or parenting classes. The caseworker provided Hollis B. with the locations of where his services could be completed. At that time, he had been referred for drug testing on five occasions and only appeared at one. During the test he appeared for, his sample was refused after he attempted to submit two separate samples, both of which were "ice cold." Out of the 11 scheduled visitations since the last hearing, Hollis B. had missed 4 due to failing to confirm the visits on time. It was reported that the visits he attended went well.

¶ 14 On February 11, 2020, the trial court held a hearing on the motion to terminate the order of continuance under supervision. Hollis B. did not appear and was therefore found in default. Christina L. appeared, stipulated to terminating the order of continuance under supervision, and again admitted to the allegations in the petition for adjudication of wardship. The court entered an order terminating the continuance under supervision. In the order, the court found that the minors were neglected in that they were in an environment injurious to their welfare as defined by section 2-3(1)(b) the Juvenile Court Act (*id*. § 2-3(1)(b)), and that they were physically abused as defined by section 2-3(2)(i) of the Juvenile Court Act (*id*. § 2-3(2)(i)). These findings were based on Christina L.'s stipulation to the motion for termination of the order of continuance under supervision and admission to the allegations in the petition for adjudication of wardship. The continuance under supervision was terminated, and a dispositional hearing was scheduled for March 17, 2020. The parents were again admonished that they must cooperate with DCFS, comply with the terms of the service plan, and correct the conditions that brought the minors into care or risk termination of their parental rights.

6

¶ 15    On March 3, 2020, Emily Wiegand, a Caritas foster care case manager, filed a dispositional hearing report, updated service plan, integrated assessment, and visitation plan. The integrated assessment explained that the case was opened because on November 1, 2018, a hotline call was made indicating that the parents frequently physically and emotionally abused their children, frequently left them home alone, did not sufficiently feed the children, and had a history of drug use. During the investigation, Hollis B. denied using instruments during physical discipline and denied injuring his children.

¶ 16    The dispositional hearing report indicated that Hollis B.'s service plan recommendations included domestic violence, substance abuse, mental health, parenting, housing, and cooperation. It was reported that he had not attended any domestic violence or parenting classes or completed a mental health or substance abuse assessment. As to housing and employment, it was reported that Hollis B. had not been employed since the case had been opened. He was reportedly staying with Christina L., which was against her housing contract. He attended 75% of his scheduled visits with the children, during which he was actively engaged and often provided a meal.

¶ 17    On June 9, 2020, Caritas filed a dispositional hearing report, which indicated that neither parent had made any progress on their services since the last report was filed. Both parents stated that they were working but refused to provide the caseworker with additional information or documentation of their employment. The parents had both been referred for five drug tests in March through May. They only attended one drug test each and were positive for amphetamines, methamphetamine, and THC. Caritas recommended that the permanency goal be changed to substitute care pending termination of parental rights.

7

¶ 18    On June 16, 2020, a virtual dispositional hearing was held, during which the parents did not appear and were both found in default.  Thereafter, the trial court entered a dispositional order with respect to A.B. and T.B., finding that, for reasons other than financial circumstances alone, Hollis B. was unfit to care for, protect, train, educate, supervise, or discipline the minors and placement with him was contrary to their health, safety, and best interests.  The court found that reasonable efforts had been made to keep the minors in the home but had not eliminated the necessity of their removal.  The court found that the service plan had been appropriate, and that appropriate services aimed at family preservation or reunification had been unsuccessful.  Therefore, the minors were made wards of the court, and custody and guardianship were placed with DCFS.

¶ 19    On June 30, 2020, Caritas filed a permanency hearing report, which stated that Hollis B. had been rated unsatisfactory on each of his services.  He had not started mental health services, domestic violence perpetrator classes, or parenting classes.  He failed to appear for 16 of the 17 scheduled drug tests since the case was opened; the one test he appeared for came back positive for methamphetamines, amphetamines, and THC.  He did not keep the caseworker informed of his living situation and contact information.  It was reported that Hollis B. had been homeless for at least the six months prior to the report; he stayed with Christina L. often even though he was not allowed on the shelter's property. He self-reported that he had gotten his old job back but refused to provide additional information or documentation of this employment.  The permanency goal was listed as substitute care pending termination of parental rights.

¶ 20　On July 14, 2020, the trial court held a permanency hearing.  The court then entered a written permanency order, finding that Hollis B. had not made reasonable efforts or substantial progress toward returning T.B. and A.B. home.  The court found that the appropriate permanency goal was for the children to return home within 12 months. Custody and guardianship remained with DCFS.

¶ 21　On December 9, 2020, Caritas filed a new family service plan.  With respect to the recommended service of cooperating with a substance abuse assessment, Hollis B. was rated unsatisfactory because he had not started this service.  He was also rated unsatisfactory for cooperating with random drug testing and maintaining a substance-free lifestyle because he only appeared for one drug test and tested positive for methamphetamine.  He was rated unsatisfactory for domestic violence counseling and refraining from domestic violence in the presence of the children because he had not begun domestic violence services.  As to parenting classes, he was rated unsatisfactory because he had not started services.  He was also rated unsatisfactory for demonstrating appropriate behavior during visitations with the children.  With respect to the mental health assessment, he was rated unsatisfactory because he had not participated in an assessment or started any other mental health services.  Finally, he was rated unsatisfactory for suitable housing, cooperating with DCFS/Caritas, and obtaining legal employment.

¶ 22　On December 11, 2020, DCFS filed a permanency hearing report, stating that Hollis B. was rated unsatisfactory as to each of his service plan tasks.  The report recommended that the permanency goal be changed to substitute care pending court termination of parental rights.  On December 22, the trial court held another permanency hearing.  It then

9

entered a written permanency order finding that Hollis B. had not made reasonable efforts or substantial progress toward returning the minors home, but the appropriate permanency goal remained for them to return home within 12 months.

¶ 23    On May 25, 2021, DCFS filed another permanency hearing report, which indicated that Hollis B. had successfully completed a parenting education program. He completed an initial mental health and substance abuse assessment on December 22, 2020. After the assessment, he was recommended for additional services but was unsuccessfully discharged for failing to attend. The report again recommended a permanency goal change to substitute care pending termination of parental rights.

¶ 24    On June 7, 2021, the State filed a petition for termination of parental rights and for appointment of a guardian with power to consent to adoption against Hollis B. and Christina L. The petition alleged that Hollis B. was unfit to have T.B. and A.B. under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)) in that he failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare; under section 1(D)(g) of the Adoption Act (*id.* § 1(D)(g)) in that he failed to protect the children from conditions within their environment injurious to their welfare; under section 1(D)(m)(i) of the Adoption Act (*id.* § 1(D)(m)(i)) in that he failed to make reasonable efforts to correct the conditions that were the basis for their removal during any nine-month period after the adjudication of neglect; and under section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)) in that he failed to make reasonable progress toward their return during any nine-month period after the adjudication of neglect. The State contended that it was in the children's best interests that Hollis B.'s rights be permanently terminated,

10

and that T.B. and A.B. be placed in DCFS guardianship so that they could be adopted. The relevant time period was June 16, 2020, through March 16, 2021.

¶ 25 On June 8, 2021, the trial court held a permanency hearing. The parents objected to the proposed order presented by the State, and a contested hearing took place. Kelsie Simpson, a foster care case manager for Caritas, testified that she consulted with both parents about their case plans. Hollis B. completed an integrated assessment in May 2019 and a substance abuse assessment in December 2020. He did not complete follow-up services as recommended and was discharged in April 2021. He was referred for 25 drug tests but only completed 2 of them. He obtained a mental health evaluation but was also discharged from those services in April 2021 due to lack of participation. He completed parenting classes through the Flourish program at Centerstone.

¶ 26 Hollis B. asked for financial assistance to pay for domestic violence classes. Simpson testified that she had to get approval for the agency to pay for the services due to him being employed. Hollis B. told the agency that he was working at the same place as Christina L. but had not yet provided paystubs to Simpson; he had, however, given her his boss's name. Simpson testified that the parents were appropriate during their visits with T.B. and A.B. However, she rated Hollis B. unsatisfactory overall for his service plan tasks due to unsuccessful discharge and lack of participation in his services, his failure to attend drug screens, and his lack of stable housing. Simpson recommended that the permanency goal be changed to termination of parental rights because the children had been in care for over two years and deserved permanency.

11

¶ 27    On cross-examination, Simpson testified that she did not know if the recommended substance abuse treatment was in person. The treatment was provided by Centerstone in Carbondale; Hollis B. lived in Anna and did not have his own transportation. The agency provided Hollis B. with a bus pass prior to Simpson taking over the case in January 2021, but he was using the bus pass to go to work instead of treatment. The bus pass was canceled in early 2021 because he failed to inform her if he was participating in in-person services. Drug testing also took place in Carbondale, and Hollis B. was given a bus pass to attend them. Simpson testified that there were no options for Hollis B. to drug test in Anna, and she was not sure how the bus pass system worked. She recalled that Hollis B. had lived at his then-current residence the whole time she had been the caseworker, and she had not completed a safety check of the home.

¶ 28    Also on June 8, 2021, the trial court entered a written permanency order finding the appropriate permanency goal was substitute care pending termination of parental rights because the parents had failed to complete the recommended services. Hollis B. had not made reasonable efforts or substantial progress toward returning the minors home.

¶ 29    The trial court held a fitness hearing on August 27, 2021, during which the following testimony was presented. Winters testified that he helped complete the integrated assessment and initial service plan for the parents and the minors in this case. The integrated assessment did not initially cover Hollis B. because he could not be located during the first two months that T.B. and A.B. were in care. Winters believed that Hollis B. was in Missouri during that time. An integrated assessment for Hollis B. was conducted in March 2019. Based on the assessment, the services recommended were mental health

12

counseling, substance abuse treatment, domestic violence classes, parenting classes, and to obtain employment and housing.

¶ 30　The State asked Winters about Hollis B.'s progress according to the initial service plan that was dated April 22, 2019, but an objection was made because that service plan was outside the nine-month period alleged in the petition for termination of parental rights. The trial court noted that there were allegations in the petition that did not necessarily apply to the nine-month period. Thus, the court allowed the question.

¶ 31　Winters testified that Hollis B. was satisfactory in completing the integrated assessment and participating in visits consistently up until May 2019. Visitation then became sporadic, but Hollis B. was less consistent with attending visitation than Christina L. Winters explained that "[o]ftentimes the children would not consistently see both parents at visitation." The visitations usually took place at the McDonald's in Mt. Vernon, and Hollis B.'s interactions with the children were appropriate.

¶ 32　The other services were rated unsatisfactory. Winters clarified that this initial service plan was a kind of "bare minimum" associated with the start of services. The subsequent service plan then would identify how Hollis B. had been progressing with his services identified in the integrated assessment and initial service plan.

¶ 33　Winters recalled that the parents had multiple residences during his time as the caseworker. His first visit to the home from which the children had been removed was unsuccessful because no one was home. The second home he visited was in Anna, where Hollis B. stayed for a while. Winters testified that another man also lived there and did not allow access into the home. Winters visited a third home where the parents lived with an

13

older couple at least two or three times. In September 2019, Winters passed the case on to another caseworker, and his involvement in the case ended at that time.

¶ 34 Next, the State called Wiegand, who worked for Caritas from September 2019 until August 2020 and was assigned to T.B. and A.B.'s cases. Wiegand helped create the March 2020 service plan. She testified that in this service plan, Hollis B.'s recommendations included substance abuse services, domestic violence services, parenting classes, stable housing, mental health services, and cooperation. Hollis B. self-reported that he went to the Fellowship House in Anna for substance abuse services, but Wiegand was unable to verify this. At that time, Hollis B. had failed to start domestic violence classes, mental health treatment, parenting classes, and had failed to either acquire or inform his caseworker about employment or stable housing. It was reported that Hollis B. had been staying with various friends.

¶ 35 Wiegand testified that she observed some visits between Hollis B. and the children during her time as the caseworker. Wiegand testified that the visitations were weekly, and Christina L. would normally confirm the visits before they took place but that she and Hollis B. shared a phone at that time. At times, Hollis B. had been unable to maintain a phone. However, the visits were not always confirmed and both parents missed visits. Wiegand testified that prior to leaving her employment with Caritas, she passed the case on to another caseworker, Luke Thompson.

¶ 36 On cross-examination, Wiegand testified that in-person visitation was shut down temporarily due to the COVID-19 pandemic. Visitations were conducted virtually during that time. The parents did not have a vehicle and the drug screens took place in Carbondale,

14

but the agency provided bus passes. Wiegand could not recall if any of the service providers halted services due to COVID-19.

¶ 37    Thompson testified that he worked at Caritas from July 2020 until January 2021 and was assigned to T.B. and A.B.'s cases. He authored the November 9, 2020, service plan in this case, which recommended mental health and substance abuse counseling, housing, parenting and domestic violence classes, and cooperation. Hollis B. had not yet completed those services. During Thompson's time as caseworker, Hollis B. was referred for three drug tests but did not attend any. The visitations that Thompson observed went well, but he also experienced times where the parents failed to confirm or missed visits.

¶ 38    On cross-examination, Thompson testified that Hollis B. told him that he was going to Centerstone for services. Thompson did a home safety check of the parents' residence and found it appropriate. He did not remember where the parents were to appear for their drug tests. Thompson testified that Hollis B. was provided with bus passes, which were renewed monthly, as well as gas cards for a vehicle they had access to at one point. During Thompson's testimony, he indicated that the parents were receiving help to obtain phones through Centerstone and that the family visits occurred in Mt. Vernon, which was approximately an hour and a half away from the parents' residence.

¶ 39    Simpson was the final caseworker to testify on behalf of the State. Simpson was assigned to T.B. and A.B.'s case from January 8, 2021, until July 12, 2021, and she created the May 17, 2021, family service plan. She testified that Hollis B. completed parenting classes but was unsuccessfully discharged from other services (substance abuse services and mental health counseling) due to nonattendance in April 2021. Hollis B. started

15

domestic violence perpetrator classes after March 2021, and he failed to complete them. Simpson did not visit the parents' residence between January and March 2021 because she was "unsure of the COVID regulations as far as entering the home." She tried to visit the residence in July 2021 but was told that it was a temporary residence.

¶ 40 Simpson observed both virtual and in-person visits between the parents and the minor children. During Simpson's testimony, she described a time where a potential domestic violence situation occurred between the parents during a virtual visitation. Hollis B. said, "You'll regret that." Christina L. responded, "If you ever put your hands on me like that again." Christina L. made additional statements as well, at least one of which may have been made toward another couple that was present in the parents' residence during the video chat. The children witnessed this incident, and Simpson had to end the visit early. Christina L.'s counsel asked during cross-examination, "Isn't it true that the people arguing in the background were actually Jessica Girardi and Kenneth Rush?" Simpson responded that she was unable to determine whether that was the case, but nevertheless, the incident affected "the well-being and safety environment" that the children needed.

¶ 41 Simpson testified that she felt the children were picking up on Hollis B.'s behavior, and that it was not a safe environment for them at that point. She sent Hollis B. for one drug screen between January and March 2021, and he failed to attend. Bus passes had been provided for Hollis B. to attend that drug screen. The bus passes were suspended after Christina L. told Simpson that the bus passes, intended only for services and visit-related transportation, were being used for other personal reasons such as work. However, Hollis

16

B. never provided proof that he was employed despite a request for pay stubs. The last known address for Hollis B. was with Christina L. and her father.

¶ 42 After the State rested its case, Hollis B. testified on his own behalf. After confirming he was the father of T.B. and A.B., he testified about the services assigned during the case. When he returned from being "stuck" in Kennett, Missouri, in October 2020, Christina L. informed him that they had to begin their service plans as quickly as possible. He testified that he completed parenting classes between April and May 2020 and was in the process of doing domestic violence services. He was also in the process of going through the drug and alcohol services, but it was paused after one session because his counselor resigned.

¶ 43 Hollis B. claimed that he completed the drugs and alcohol course, but he was not certain about the other programs he had to finish. He was able to obtain and maintain employment in June 2020 through Super 8 and then in May 2021 with Family Matters in Cape Girardeau, Missouri. Between these two jobs, he sent out applications and searched for jobs but was unsuccessful in finding one.

¶ 44 Hollis B. testified that there were misunderstandings between him and the caseworkers. He claimed that Simpson would schedule visitations at one location and then move them to another location at the last minute. He testified that the communication failure extended to a case aide and her supervisor. Hollis B. claimed that these failures caused visits to be cancelled "[a] lot of times." On cross-examination, Hollis B. admitted that he did not engage in services until November 2020. He also admitted that his domestic violence, mental health, and substance abuse services still needed to be completed.

17

¶ 45   After Hollis B.'s testimony, the trial court found that the State met its burden of proving Christina L. and Hollis B. to be unfit by clear and convincing evidence. The court found that the parents failed to maintain a reasonable degree of interest, concern, and responsibility as to the children's welfare; failed to protect them from conditions within their environment injurious to their welfare; failed to make reasonable efforts to correct the conditions that were the basis for the children's removal during any nine-month period following adjudication of abuse and neglect; and failed to make reasonable progress towards the return of the children during a nine-month period following adjudication.

¶ 46   The trial court found that neither parent had completed all the services they were required to complete as set forth in their service plans. The court indicated that it understood that COVID-19 added difficulty and challenges, but COVID-19 only affected a few months within the nine-month period. The adjudication was in early 2020, but the petition for termination of parental rights was not filed until June 2021. The court understood that the parents loved their children and wanted them back in their care but found that they had not made reasonable efforts or substantial progress during the nine-month period alleged by the State. The court also indicated that the parents had only recently begun involvement in some services that could have been addressed much earlier.

¶ 47   The trial court found that both Hollis B. and Christina L. continued to have issues with stable employment and housing. The court was concerned by the parents' failure to undergo the drug testing that was scheduled for them. The court acknowledged that it was difficult for them to travel to Carbondale for the drug tests. However, the court was apprehensive about returning children to the care of parents with substance abuse issues

18

when substance abuse treatment had not been completed. The court further noted that the initial petition alleged domestic violence and physical abuse. In the three years since the inception of this case, neither Hollis B. nor Christina L. had completed domestic violence services. The court found both parents to be unfit.

¶ 48 Immediately after the fitness hearing, the trial court held the best-interests hearing. Erica Berner, a Caritas foster care case manager, testified that she had been assigned to T.B. and A.B.'s case two weeks prior to the hearing. She met with the children and their foster parent, Jeremy Price. Berner believed that the children had formed an attachment to Price. He had been caring for T.B. and A.B for about one and a half years after the children were removed from an abusive foster placement. T.B. and A.B. were receiving counseling on a weekly basis. Price's home was clean and both children had their own bedrooms. Price's parents lived two houses away from him, and they assisted with the children. Berner testified that both children were comfortable with Price and in their spaces at his house. They would talk, laugh, smile together, and call Price "Dad." Price wished to adopt both T.B. and A.B. Berner had not spoken to the children about their parents.

¶ 49 Price testified that he had known T.B. and A.B. for three years. He lived in a three-bedroom home with a fenced-in yard. A.B. was on a flag football team, and T.B. played soccer. Price took the children to doctor and counseling appointments. A.B. had emotional issues and had been diagnosed with oppositional defiant disorder and attention deficit hyperactivity disorder (ADHD). T.B. also had defiance issues and attended counseling sessions but had not received a diagnosis. Both T.B. and A.B. were in third grade. T.B. was a straight-A student, and A.B. was improving while they were working on medication

for his ADHD. Price's parents helped with the children. The children had a good relationship with Price's parents and called them "Dodo" and "Pop." Price was questioned about raising biracial children. T.B. and A.B. are biracial and Price is not. Price testified that he has friends and coworkers with a mixed-race background who provided information on raising children under these circumstances. Price testified that he would like to adopt both T.B. and A.B.

¶ 50    Christina L. then testified, *inter alia*, that she loved her children and wanted her children to be returned to her care. At the conclusion of the hearing, the trial court found that T.B. and A.B. had been in foster care for over three years and had bonded with Price. Although the parents had attempted to engage in some services, they did not start some of them until after the petition for termination of parental rights was filed, they were still unstable, they could not fully support and take care of themselves, and the substance abuse and domestic violence issues were unresolved. Thus, the court found that it was in the best interests of the minors for the petition for termination of parental rights to be granted. The permanency goal was changed to adoption. This appeal followed.

¶ 51                                    II. ANALYSIS

¶ 52    On appeal, Hollis B. argues that the trial court erred in finding him unfit under sections 1(D)(b), (g), (m)(i), and (m)(ii) of the Adoption Act (*id*. §§ 1(D)(b), (g), (m)(i), (m)(ii)) because the State failed to prove him unfit by clear and convincing evidence.

¶ 53    Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). *In re D.F.*, 201 Ill. 2d 476, 494 (2002). A petition to terminate parental

rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process in seeking to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2018). The State must first establish, by clear and convincing evidence, that the parent is unfit under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). 705 ILCS 405/2-29(2), (4) (West 2020); *In re D.F.*, 201 Ill. 2d at 494-95. Because each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 54 Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000). Thus, parental rights may be terminated only after a finding of unfitness that is supported by clear and convincing evidence. *In re Gwynne P.*, 346 Ill. App. 3d 584, 590 (2004). A finding of unfitness will not be disturbed unless it is against the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence. *In re D.F.*, 201 Ill. 2d at 498. A trial court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Thus, a reviewing court does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001).

¶ 55 Here, the trial court found Hollis B. unfit for the following four grounds: (1) under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)), he failed to

21

maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare; (2) under section 1(D)(g) of the Adoption Act (*id*. § 1(d)(g)), he failed to protect the children from conditions within their environment injurious to their welfare; (3) under section 1(D)(m)(i) of the Adoption Act (*id*. § 1(D)(m)(i)), he failed to make reasonable efforts to correct the conditions that were the basis for the children's removal during a nine-month period after the adjudication of neglect or abuse, specifically between June 16, 2020, and March 16, 2021; and (4) under section 1(D)(m)(ii) of the Adoption Act (*id*. § 1(D)(m)(ii)), he failed to make reasonable progress toward the children's return during a nine-month period after the adjudication of neglect or abuse, specifically between June 16, 2020, through March 16, 2021.

¶ 56 Reasonable efforts and reasonable progress are two distinct grounds of unfitness under section 1(D)(m). *In re Daphnie E.*, 368 Ill. App. 3d at 1066. Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the child and are judged by a subjective standard based upon the amount of effort that is reasonable for that particular parent. *In re R.L.*, 352 Ill. App. 3d at 998. The court must determine whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. In contrast, reasonable progress is judged using an objective standard that focuses on the steps the parent has taken toward the goal of reunification. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. The standard by which progress is measured is the parent's compliance with the court's directives and the service plans in light of the conditions that gave rise to removal and other conditions that later become known and would prevent the

court from returning custody of the child to the parent. *Id.* "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *In re Daphnie E.*, 368 Ill. App. 3d at 1067.

¶ 57 The record reveals that A.B. and T.B. were brought into care due to allegations that their environment was injurious to their welfare and that their parents inflicted or allowed abuse to be inflicted through excessive corporal punishment. It was alleged that Hollis B. was on probation for a methamphetamine-related offense; the children were left home alone and were too young to be left alone; T.B. disclosed that Hollis B. put Christina L. in a "choke hold" in front of the children; A.B. disclosed that Hollis B. had hit him with a paddle, hand, shoe, or belt, leaving marks described as welts; Christina L. was unable to stop him from hitting A.B.; A.B. reported that Christina L. did not allow him to talk about drugs; and both parents refused to submit to drug testing. Throughout the life of the case, Hollis B.'s service plan tasks were to (1) complete an integrated assessment, (2) comply with any recommended services, (3) complete a substance abuse assessment, (4) cooperate with Caritas and DCFS, (5) maintain a substance-free lifestyle, (6) submit to drug testing, (7) complete a domestic violence assessment, (8) participate in domestic violence counseling, (9) abstain from further episodes of domestic violence within the home, (10) complete a mental health assessment, (11) complete parenting classes, and (12) obtain suitable housing and employment.

¶ 58 The State identified the relevant nine-month period for reasonable efforts and reasonable progress as June 16, 2020, through March 16, 2021. During this time, Hollis B. completed a parenting education program as well as an initial mental health and

23

substance abuse assessment. He self-reported that he was employed at times but refused to provide additional information or documentation of his employment. The evidence also indicated that he interacted appropriately with A.B. and T.B. during their visits.

¶ 59 Nevertheless, the record reveals that Hollis B. failed to complete services related to correcting the issues that brought T.B. and A.B. into care, *i.e*., domestic violence and substance abuse. Although he completed the initial mental health and substance abuse assessment, he failed to engage in additional recommended services and was unsuccessfully discharged for failing to attend. Thompson and Simpson's testimony indicated that Hollis B. was referred for four drug tests during the relevant nine-month period, but he failed to attend any of them. Although he lacked transportation, he was provided with bus passes and gas cards to attend his services and drug tests. Instead of using the bus passes to attend his services or drug screens, however, he used them for personal reasons such as work, which led to them being revoked. The evidence further indicated that Hollis B. struggled to maintain stable housing and employment during the relevant nine-month period.

¶ 60 The trial court further noted that the initial petition alleged domestic violence and physical abuse. In the three years since the inception of this case, Hollis B. had not completed domestic violence services and did not enroll in such services until after the relevant nine-month period. On March 9, 2021, an online visitation session was terminated early by Simpson after comments indicative of domestic violence remaining in the household were made during the session. Simpson felt that the children were picking up on Hollis B.'s behavior, and that it was not a safe environment for them at that point.

24

Although Hollis B. also argues that Simpson's testimony was not credible, she was cross-examined as to the domestic violence incident and acknowledged that there were other individuals who could have made the comments. Nevertheless, she concluded that the incident affected the children's well-being and the safe environment that they needed. The trial court was in a better position to assess Simpson's credibility and weigh the evidence presented, and we will defer to it on such matters. See *In re M.A.*, 325 Ill. App. 3d at 391.

¶ 61 On appeal, Hollis B. argues that his lack of reasonable efforts or progress should be excused because the relevant nine-month period was during the COVID-19 pandemic, because of his lack of transportation, and because he had difficulty setting up his services. However, we find that these issues were before the trial court during the fitness hearing, and the court considered them in rendering its decision. The court explicitly acknowledged that COVID-19 added difficulty and challenges to the parents' ability to complete their services but only affected a few months within the nine-month period. The court also acknowledged that it was difficult for the parents to travel to Carbondale for drug testing, but it was concerned by their failure to undergo the drug testing that was scheduled for them and was apprehensive about returning T.B. and A.B. to the care of parents with substance abuse issues when substance abuse treatment had not been completed. Again, we note that Hollis B. was provided with bus passes and gas cards to accommodate his travel for drug tests and services. The court was also familiar with Hollis B.'s requests for financial assistance with his domestic violence classes and the agency's response.

¶ 62 Based on the evidence presented at the fitness hearing, along with Hollis B.'s continued refusal to comply with the substance abuse and domestic violence portions of

his service plan and correct those issues that led to T.B. and A.B. being taken into care, we find that the trial court's conclusion that the State proved by clear and convincing evidence that Hollis B. was unfit in that he had not made reasonable efforts or progress during the nine-month period immediately following the adjudication of neglect and abuse was not against the manifest weight of the evidence. Having determined there was adequate evidence to satisfy two statutory grounds of unfitness, we need not address the other findings of unfitness made by the court. See *In re C.W.*, 199 Ill. 2d at 217.

¶ 63    Lastly, we note that Hollis B. did not appeal the best-interests determination. Having reviewed the evidence presented at the best-interests hearing, we conclude that the trial court's determination that the termination was in the best interests of T.B. and A.B. was not against the manifest weight of the evidence.

¶ 64                                    III. CONCLUSION

¶ 65    For the foregoing reasons, we affirm the judgment of the circuit court of Union County.

¶ 66    Affirmed.